UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------
PROTECTIVE SPECIALTY INSURANCE
COMPANY,

                                      Plaintiff,                          **OPINION & ORDER**

            - against -                                                   17-CV-8965 (CS)

CASTLE TITLE INSURANCE AGENCY, INC.,


                                      Defendant.
   ------------------------------------------------------------------

<u>Appearances:</u>

Phyllis A. Ingram
Greg M. Steinberg
White and Williams LLP
New York, New York
*Counsel for Plaintiff*

Laura-Michelle Horgan
Rita Lenane-Massey
Barton LLP
New York, New York
*Counsel for Defendant*

<u>Seibel, J.</u>

        On November 16, 2017, Plaintiff Protective Specialty Insurance Company ("Protective")

initiated this action seeking a declaratory judgment that it has no duty to defend Defendant

Castle Title Insurance Agency, Inc. ("Castle Title"), in a 2016 action commenced in the Supreme

Court of the State of New York in Westchester County (the "2016 Lawsuit").  (Doc. 1

("Compl.").)[1]  Before the Court are the parties' cross motions for summary judgment.  (Docs. 58,

---

[1] Protective's Complaint sought the Court's consideration of its duty both to defend and
indemnify Castle Title in connection with the 2016 Lawsuit.  (*See* Compl. ¶ 4.)  But on June 28,
2019, the New York State Supreme Court dismissed all claims and cross-claims against Castle

66.)  For the following reasons, Defendant's motion is GRANTED and Plaintiff's motion is

DENIED.

## I.    BACKGROUND

### A.    Facts

The following facts are based on the parties' Local Civil Rule 56.1 statements, replies,

and supporting materials, and are undisputed except as noted.[2]

---

Title in the 2016 Lawsuit, (Doc. 87-1), rendering moot Protective's duty to indemnify Castle
Title in that case.  Accordingly, I consider only Protective's duty to defend Castle Title.
Protective apparently agrees with that approach because in a July 9, 2019 letter regarding the
dismissal, Protective stated that "[t]he issue before this Court is whether Protective has a duty to
defend Castle Title in the 2016 Lawsuit."  (Doc. 88 at 1.)

[2] Both parties' Rule 56.1 Statements fail to comply with the letter and spirit of the rule.  (*See*
Doc. 73 ("P's 56.1 Resp."); Doc. 64 ("D's 56.1 Resp.").)  Many of the parties' purported denials
improperly assert that the other party's 56.1 statements are "vague," "inaccurate," or
"incomplete."  (*See* P's 56.1 Resp. ¶¶ 5-7, 10, 17, 26-30, 40-41, 43, 45-47, 49, 51; D's 56.1
Resp. ¶¶ 13, 32, 43, 45, 53.)  These objections are insufficient to meet a party's burden to raise
genuine disputes of material facts and the Court treats the parties' properly supported statements
as admitted.  *See Vantone Grp. Ltd. Liab. Co. v. Yangpu NGT Indus. Co.*, No. 13-CV-7639, 2016
WL 4098564, at *1 n.2 (S.D.N.Y. July 28, 2016); *see also Weider Health & Fitness v. AusTex
Oil Ltd.*, No. 17-CV-2089, 2018 WL 8579820, at *2 (S.D.N.Y. Dec. 19, 2018), *report and
recommendation adopted*, 2019 WL 1324049 (S.D.N.Y. Mar. 25, 2019).  Several of Plaintiff's
56.1 responses deny Defendant's statement – sometimes without explanation, (*see, e.g.*, P's 56.1
Resp. ¶ 19), or without a comprehensible explanation, (*see, e.g.*, *id.* ¶ 15) – and refer the Court to
an entire document "for the true and complete contents thereof," (*see id.* ¶¶ 5-6, 10, 12, 15-19,
24, 26-30, 40-41, 43, 51, 53).  Some of Defendant's 56.1 responses also either admit or deny
Plaintiff's statement – sometimes in similarly unhelpful fashion, (*see, e.g.*, D's 56.1 Resp. ¶¶ 6,
17) – but then generally refer to an entire document "for the full and complete contents thereof,"
(*see id.* ¶¶ 2, 23, 37-39, 43-45, 55, 65-67, 69-71).  But responses that "do not point to any
evidence in the record that may create a genuine issue of material fact[] do not function as
denials, and will be deemed admissions of the stated fact."  *Risco v. McHugh*, 868 F. Supp. 2d
75, 85 n.2 (S.D.N.Y. 2012) (internal quotation marks omitted); *see Costello v. N.Y. State Nurses
Ass'n*, 783 F. Supp. 2d 656, 661 n.5 (S.D.N.Y. 2011) (disregarding plaintiff's responses where
plaintiff failed to specifically dispute defendant's statements).  It is not the job of a district court
judge to sift through entire documents in search of a fact dispute.  Because the parties'
inadequate responses do not meet the burden under Rule 56(c) to cite particularized evidence
showing a genuine dispute, the Court deems the corresponding facts admitted.  *See, e.g.*,
*Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 291-92 (2d Cir. 2000) (affirming district
court's grant of motion for summary judgment for defendants where plaintiffs' counterstatement

### 1.     Policy 18-01

From 2014 to 2017, Protective issued to Castle Title three consecutive professional liability insurance policies.  (P's 56.1 Resp. ¶¶ 9, 23; *see* Doc. 61-7 ("Policy 18-00"); Compl. Ex. A ("Policy 18-01"); Doc. 61-11 ("Policy 18-02").)  Prior to the expiration of Policy 18-00 on September 10, 2015, Castle Title applied to Protective for a second year of coverage.  (P's 56.1 Resp. ¶ 14.)  On September 9, 2015, Ronald Rauschenbach, president and owner of Castle Title, completed a "Title Agents, Abstractor/Searchers and Escrow/Closing Agents Application" through American Insurance Professionals LLC ("AIP") to obtain Policy 18-01.  (*Id.* ¶ 8; *see* Compl. Ex. H ("AIP Application").)  The AIP Application contains a section entitled "Loss/Claim Information" that asks several questions, including:

> 38.     Is the Applicant or any other person proposed for insurance aware of any incident or circumstance which MAY RESULT in a CLAIM being made against the Applicant or any past or present owners, partners, officers, directors, employees or predecessors in business?

(AIP Application at 6 (emphasis in original).)  Rauschenbach selected "No" in response to this question.  (*Id.*)  The AIP Application also stated, "Please be advised that any proceedings, claims, incidents and/or circumstances identified in responses to question number . . . 38 will be excluded from any coverage resulting from this application."  (*Id.* (emphasis omitted).)  Further, the AIP Application contained a "Supplemental Claim / Incident / Circumstance Information Sheet" on which Rauschenbach certified that he had not had any claims in the past five years.  (*Id.* at 9.)

---

failed to set forth particularized evidence showing a triable issue); *Johnson v. City of N.Y.*, No. 10-CV-6294, 2012 WL 1076008, at *3 (S.D.N.Y. Mar. 28, 2012) (court is not obligated "to perform an independent review of the record to find proof of a factual dispute") (internal quotation marks omitted).

Protective agreed to underwrite a second insurance policy for Castle Title – Policy 18-01 – with a policy period of September 10, 2015, to September 10, 2016.  (Policy 18-01 at 1; P's 56.1 Resp. ¶ 15.)  Policy 18-01 is a "claims made and reported policy" that applies only to claims made and reported during the relevant policy period.  (Policy 18-01 at 1 (emphasis omitted).)  A "Claim" is defined in § III(C)(4) of Policy 18-01 to include "a written demand by subpoena upon an Insured as a non-party to litigation or arbitration involving Professional Services provided by such Insured."  (*Id.* § III(C)(4) (emphasis omitted).)  "Related Claims" are defined as

> all Claims . . . arising out of a single Wrongful Act or a series of Wrongful Acts that have a common nexus, are interrelated or are logically or causally connected by reason of any fact, circumstance, situation, event, transaction, practice, act, error, omission, decision or cause or series of causally-connected facts, circumstances, situations, events, transactions, practices, acts, errors, omissions, decisions or causes.

(*Id.* § III(U) (emphasis omitted).)  A "Wrongful Act" includes "a negligent act, error or omission or Personal Injury committed by an Insured or any natural person for whose Wrongful Acts the Insured is legally responsible solely in the rendering or failing to render Professional Services for a client for a fee or other compensation."  (*Id.* § III(Y) (emphasis omitted).)  Under the policy, "[a]ll Related Claims shall be deemed a single Claim, and such Claim shall be considered first made on the date the earliest such Related Claim is first made against an Insured, regardless of whether such date is before or during the Policy Period."  (*Id.* § V(C) (emphasis omitted).)

## 2.    The 2010 Foreclosure Actions

On August 20, 2010, Sovereign Bank filed two foreclosure actions in New York Supreme Court in Westchester County.  (P's 56.1 Resp. ¶¶ 30, 35; *see id.* ¶¶ 29-47.)  In the first action ("Foreclosure Action 1"), Sovereign Bank sought to foreclose on a mortgage it had granted to

Fox Island Properties, LLC, that was in default. (*Id.* ¶ 30; *see* Doc. 61-17.)[3] The sole cause of

action alleged by Sovereign Bank was for "foreclosure of mortgage," and the relief sought by

Sovereign Bank was a judgment of foreclosure and sale of the property secured by a note held by

Sovereign Bank. (P's 56.1 Resp. ¶ 31; *see* Doc. 61-17 ¶¶ 38-43.) In the second foreclosure

action ("Foreclosure Action 2"), Sovereign Bank sought to reform a mortgage to correct a

property description and foreclose on several mortgages granted to Fox Island Properties that

were in default. (P's 56.1 Resp. ¶ 35; *see* Doc. 80-19.)[4] The sole causes of action alleged by

Sovereign Bank were "foreclosure of mortgage" and "reformation of property description in

mortgage." (P's 56.1 Resp. ¶ 36; Doc. 80-19 ¶¶ 39-50.) Castle Title was not a party to

Foreclosure Action 1 or Foreclosure Action 2 (collectively, the "Foreclosure Actions"), (P's 56.1

Resp. ¶¶ 32, 37), and the claims alleged in the Foreclosure Actions did not involve any

professional services provided by Castle Title, (*id.* ¶ 39).

In 2011, during the course of the Foreclosure Actions, Sovereign Bank assigned its

interest in the debt to SR Holdings I, LLC ("SR Holdings"), and SR Holdings was substituted

into the actions as plaintiff. (*Id.* ¶ 33.) On September 24, 2012, a final judgment of deficiency in

the amount of $2,836,459.42 was issued to SR Holdings in Foreclosure Action 1, (*id.* ¶ 34), and

on January 7, 2013, a final judgment of deficiency in the amount of $1,618,929.82 was issued to

SR Holdings in Foreclosure Action 2, (*id.* ¶ 38).

---

[3] *See Sovereign Bank v. Fox Island Props., LLC*, Index No. 20492/2010 (N.Y. Sup. Ct. 2010).

[4] *See Sovereign Bank v. Fox Island Props., LLC*, Index No. 20493/2010 (N.Y. Sup. Ct. 2010).

### 3. The 2013 Lawsuit

On March 21, 2013, SR Holdings filed a lawsuit in the Westchester County Supreme Court (the "2013 Lawsuit") against certain defendants in the Foreclosure Actions and others, seeking to set aside certain conveyances and to declare them null and void on the basis that they were made to avoid payment of the judgment issued in Foreclosure Action 1.[5] (D's 56.1 Resp. ¶ 13; Doc. 80-23 at 54.) Castle Title was not a party to the 2013 Lawsuit. (D's 56.1 Resp. ¶ 14.) On September 11, 2015, SR Holdings filed a motion for leave to amend the complaint in the 2013 Lawsuit to add Castle Title as a defendant, (Doc. 80-24 ¶¶ 2, 11, 23), which was denied on October 28, 2015, (*see* Doc. 80-26). On November 7, 2016, the 2013 Lawsuit was dismissed without prejudice for failure to name all necessary parties. (*See* Doc. 80-27 at 6:3-5.) There is no evidence that Castle Title was aware of the 2013 Lawsuit at the time.[6]

### 4. The 2015 Subpoena

On July 21, 2015, Castle Title was served with a post-judgment judicial subpoena *duces tecum*. (P's 56.1 Resp. ¶¶ 26, 40; *see* Compl. Ex. C ("2015 Subpoena").) The 2015 Subpoena bore the caption of Foreclosure Action 1 and was issued by SR Holdings as judgment creditor in

---

[5] *See SR Holdings I, LLC v. Cannavo*, Index No. 54196/2013 (N.Y. Sup. Ct. 2013).

[6] Protective argues that Castle Title was aware of the 2013 Lawsuit because Rauschenbach testified at an August 22, 2018 deposition that he could not recall whether he had provided testimony in connection with the 2013 Lawsuit. (Doc. 79 ("P's Mem.") at 3 n.2; *see* Doc. 80-18 at 45:11-16.) But that fact does not show that he knew about the 2013 Lawsuit while it was going on. First, Rauschenbach testified that his knowledge of the 2013 Lawsuit was based on what he learned from reading the pleadings in the instant case. (Doc. 80-18 at 44:12-45:10.) Second, although Rauschenbach had previously given a deposition (on November 1, 2016), that deposition was in connection with Foreclosure Action 1, not the 2013 Lawsuit. (*See* Doc. 80-32.) Third, as a matter of logic, Rauschenbach's lack of recollection in 2016 about whether he testified in the 2013 Lawsuit does not amount to evidence that he did testify and therefore knew about the 2013 Lawsuit. Finally, in any event, Protective does not claim (in the Complaint or otherwise) that the 2013 Lawsuit is a "Related Claim" relieving it of its obligation to defend the 2016 Lawsuit.

the amount of $2,836,459.42, together with unpaid interest from September 24, 2012. (*See* 2015

Subpoena at 1-2.) SR Holdings sought documents from Castle Title as title agent and asserted

that these documents were "material and necessary to determine the bona fides of the various

transfers, mortgages, mortgage debts and interest in the properties, to establish the chain of

encumbrances and the chain of title and to determine the equity values of the properties." (*Id.* at

2.)

     Castle Title did not timely comply with its obligation to produce documents in response

to the 2015 Subpoena, (P's 56.1 Resp. ¶ 43), and on October 8, 2015, SR Holdings filed a

motion to compel, (Compl. Ex. D). The motion to compel stated that the 2015 Subpoena was

"issued to aid in the enforcement of the judgment" obtained in "[t]he above entitled mortgage

foreclosure action" – *i.e.*, Foreclosure Action 1. (*Id.* Ex. D at 4,11.)[7] In the motion to compel,

SR Holdings argued that as "Judgment Creditor," it was "entitled to the documents requested" in

the 2015 Subpoena. (*Id.* Ex. D at 4.) The motion was unopposed. (*Id.* Ex. E at 2.) On October

7, 2015, New York Supreme Court Justice Mary H. Smith issued a Decision and Order directing

Castle Title, as a non-party, to comply with "a subpoena issued . . . to aid in the enforcement of a

judgment." (*Id.* Ex. E at 2.) On October 27, 2015, SR Holdings filed a motion for contempt

based on Castle Title's failure to comply with the 2015 Subpoena and Justice Smith's Order. (*Id.*

Ex. F at 1-2.) On December 15, 2015, Justice Smith granted the contempt motion, (*id.* Ex. G at

2), and on April 21, 2016, after Castle Title complied, (*see* Doc. 80-18 at 71), she vacated it,

(Doc. 80-33).

---

[7] Because Compl. Ex. D is not continuously paginated, pincites refer to the page numbers
generated by the ECF system.

## 5.     The 2016 Lawsuit

On April 1, 2016, SR Holdings named Castle Title as a defendant in the 2016 Lawsuit filed in Westchester County Supreme Court.[8]  (D's 56.1 Resp. ¶ 43; *see* Doc. 80-34.)  On November 14, 2016, SR Holdings amended the complaint in the 2016 Lawsuit.  (P's 56.1 Resp. ¶¶ 2, 48-49; *see* Compl. Ex. B ("2016 Lawsuit Compl.").)  The amended complaint alleged that Castle Title "negligently and/or fraudulently delayed" in submitting real estate documents for recording by the County Clerk.  (2016 Lawsuit Compl. ¶¶ 546-554.)  SR Holdings also asserted general claims for conspiracy, fraud, and fraudulent conveyance against all defendants.  (*Id.* ¶¶ 555-599.)  On July 5, 2016, Castle Title received the 2016 Complaint by certified mail.  (P's 56.1 Resp. ¶ 52; Compl. Ex. I at 2.)  By email dated July 19, 2016, Castle Title's insurance broker, AIP, provided notice of the 2016 Lawsuit notice to Protective under Policy 18-01.  (P's 56.1 Resp. ¶ 52; Compl. Ex. I at 1.)  By letter dated August 8, 2016, Protective acknowledged receipt of the 2016 Lawsuit and reserved its rights.  (P's 56.1 Resp. ¶ 53; Compl. Ex. J.)

On September 8, 2016 – prior to Policy 18-01's expiration – Rauschenbach applied to Protective for a third year of insurance coverage by submitting another "Title Agents, Abstractor/Searchers, and Escrow/Closing Agents Application" through AIP.  (Doc. 61-10.)  Rauschenbach disclosed in the application the fact that Castle Title had been named as a defendant in the 2016 Lawsuit.  (*Id.* at 9.)  He listed the "date of alleged act or omission" as "2012?  2013?" and identified the "date of claim made" as July 19, 2016, (*id.*), which is the date that AIP provided notice of the 2016 Lawsuit notice to Protective under Policy 18-01, (P's 56.1 Resp. ¶ 52; Compl. Ex. I at 1).  Protective issued Policy 18-02 for the period September 10, 2016, to September 10, 2017.  (Doc. 61-11.)

---

[8] *See SR Holdings I, LLC v. Cannavo*, Index No. 54202/2016 (N.Y. Sup. Ct. 2016).

On March 21, 2017, and September 25, 2017, Protective issued supplemental coverage position letters for the 2016 Lawsuit, reserving its rights under Policy 18-01. (D's 56.1 Resp. ¶¶ 70-71; Compl. Exs. K-L.) On June 28, 2019, all claims and cross-claims against Castle Title in the 2016 Lawsuit were dismissed by the Westchester County Supreme Court. (*See* Doc. 87-1.)

## B. <u>Procedural History</u>

On November 16, 2017, Protective filed the instant case against Castle Title seeking a declaratory judgment that Protective has no duty to defend or indemnify Castle Title in the 2016 Lawsuit. (Compl.) Defendant answered on January 26, 2018. (Doc. 18.) On November 1, 2018, following discovery, both parties filed pre-motion letters in anticipation of their motions for summary judgment, (Docs. 41, 42), and the Court held a pre-motion conference on November 13, 2018, (Minute Entry dated Nov. 13, 2018). The instant motions followed.

Plaintiff seeks declaratory relief on the following four causes of action: (1) "Claim Deemed First Made Prior to Policy Period," (Compl. ¶¶ 46-52); (2) "Warranty Exclusion," (*id.* ¶¶ 53-59); (3) "No 'Loss,'" (*id.* ¶¶ 65-70); and (4) "Recoupment of Defense Costs," (*id.* ¶¶ 71-74).[9]

## II. <u>LEGAL STANDARD</u>

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that

---

[9] On September 17, 2018, the parties jointly stipulated to the dismissal of Plaintiff's third cause of action for "Conduct Exclusion," (Compl. ¶¶ 60-64). (*See* Doc. 40.) On December 18, 2018, Plaintiff voluntarily dismissed Rauschenbach from the case. (Doc. 50.)

a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). Where an affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino,*

*Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

Where, as here, the Court simultaneously is considering multiple motions for summary judgment, the Court applies the same summary judgment standard as that used for deciding individual motions for summary judgment. *See Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193, 200 (2d Cir. 2008) (explaining that facts must be construed in the light most favorable to the non-moving party for each cross-motion for summary judgment); *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) ("[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."). Where the motion and cross motion seek a determination of the same issue, however, the Court may address them together. *See Royal & Sun All. Ins., PLC v. E.C.M. Transp., Inc*., No. 14-CV-3770, 2015 WL 5098119, at *2 (S.D.N.Y. Aug. 31, 2015); *Chartis Seguros Mex., S.A. de C.V. v. HLI Rail & Rigging, LLC*, 3 F. Supp. 3d 171, 179 (S.D.N.Y. 2014).

## III.     DISCUSSION

"Under New York law, insurance policies are interpreted according to general rules of contract interpretation." *Olin Corp. v. Am. Home Assurance Co.*, 704 F.3d 89, 98 (2d Cir. 2012) (footnote omitted).[10] Specifically, "'words and phrases [in a contract] should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its

---

[10] Neither party disputes that New York law governs the interpretation of the insurance policy.

provisions.'" *Id.* at 99 (alteration in original) (quoting *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005)). "Unambiguous terms are to be given their plain and ordinary meaning, and ambiguous language should be construed in accordance with the reasonable expectations of the insured when [it] entered into the contract." *Nat'l Union Fire Ins. Co. of Pittsburgh v. Stroh Cos.*, 265 F.3d 97, 103 (2d Cir. 2001) (internal quotation marks omitted). "[C]ontract terms are ambiguous if they are capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Olin Corp.*, 704 F.3d at 99 (internal quotation marks omitted). If the insurance policy is ambiguous, the court may consider extrinsic evidence to determine the parties' intent in the formation of the policy. *Id.* "[I]f the extrinsic evidence does not yield a conclusive answer as to the parties' intent, a court may apply other rules of contract construction, including the rule of *contra proferentem*," meaning that any ambiguity in an insurance policy drafted by the insurer should be resolved in the insured's favor. *Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 43 (2d Cir. 2006) (alteration and internal quotation marks omitted).

A. **First Cause of Action – Claim Deemed First Made Prior to Policy Period**

Protective argues that the 2015 Subpoena was a "Claim" under the terms of Policy 18-00 and Policy 18-01; it was not reported to Protective when it was made during the term of Policy 18-00; while Castle Title did report the 2016 Lawsuit as a Claim during the term of Policy 18-01, the 2016 Lawsuit and the 2015 Subpoena are "Related Claims" and thus deemed to have been made when the earlier Claim was made; because that earlier Claim was made during the term of Policy 18-00 but not reported at that time, Protective has no obligation to defend Castle Title

12

under Policy 18-00; and because the Claim was made before Policy 18-01 came into effect, Protective has no obligation to defend Castle Title under that policy either. In other words, if the 2015 Subpoena and 2016 Lawsuit are "Related Claims," then they are considered a single claim made on the earliest date either was first made against Castle Title, (Policy 18-01 § V(C)), which in this case is July 21, 2015, the date Castle Title was served with the 2015 Subpoena. Because July 21, 2015, predates Policy 18-01's policy period of September 10, 2015, to September 10, 2016, Protective would be able to disclaim coverage under Policy 18-01 for the 2016 Lawsuit, and because the 2015 Subpoena was not reported to Protective during the policy period of Policy 18-00, Protective would be able to disclaim coverage under that policy as well.

Neither party contends that Policy 18-01 or its definitions of "Claim" or "Related Claims" are ambiguous. But Castle Title contends that the 2015 Subpoena and 2016 Lawsuit are not "Related Claims" because the 2015 Subpoena is not a "Claim" at all. It argues that the 2015 Subpoena was issued to it as a non-party to litigation involving the foreclosure of mortgages, not litigation involving its services, and thus the 2015 Subpoena was not issued to Castle Title "as a non-party to litigation or arbitration involving Professional Services provided by" Castle Title. (Doc. 59 ("D's Mem.") at 6-9.) Protective asserts that the phrase "involving Professional Services by [the insured]" in Section III(C)(4) of Policy 18-01 modifies "subpoena," not "litigation or arbitration," and thus the 2015 Subpoena is a "Claim" because Castle Title rendered professional services in connection with the properties that are the subject of the 2015 Subpoena. (P's Mem. at 12-14.)

I reject Protective's argument. The only reasonable interpretation of the language of Policy 18-01's definition of "Claim" is that the adjectival clause "involving professional services" modifies the nouns that it immediately follows, which is "litigation or arbitration." The

language of Policy 18-01 asks whether the "litigation or arbitration" pursuant to which the 2015 Subpoena was issued "involve[es] [Castle Title's] Professional Services." (*See* Policy 18-01 § III(C)(4) (emphasis omitted).) Therefore, to qualify as a "Claim" under that section, the "Claim" must be a subpoena issued in a "litigation or arbitration" "involving Professional Services" by Castle Title.

The 2015 Subpoena does not so qualify. It was a post-judgment subpoena issued by SR Holdings, a judgment creditor, in an effort to enforce the judgment resulting from Foreclosure Action 1. The 2015 Subpoena bears the caption and index number for Foreclosure Action 1. It explicitly states that it has was issued by SR Holdings as "judgment creditor" in Foreclosure Action 1. There were no claims in either Foreclosure Action against Castle Title, nor any allegation relating to anything Castle Title did or did not do. The post-judgment subpoena was for the purpose of enforcing the judgment, not questioning Castle Title's professional services. There was no litigation involving Castle Title's "Professional Services" until SR Holdings commenced the 2016 Lawsuit. Because the 2015 Subpoena was issued in connection with Foreclosure Action 1, and because Foreclosure Action 1 did not "involve[e] Professional Services provided by" Castle Title, the 2015 Subpoena is not a "Claim" under Policy 18-01. *See U.S. Fid. & Guar. Co. v. Guenther*, 281 U.S. 34, 37 (1930) ("[C]ontracts of insurance . . . are to be construed according to the sense and meaning of the terms which the parties have used, and, if they are clear and unambiguous, their terms are to be taken and understood in their plain, ordinary, and popular sense.") (internal quotation marks omitted); *Andy Warhol Found. for Visual Arts, Inc. v. Fed. Ins. Co.*, 189 F.3d 208, 215 (2d Cir. 1999) ("[A]n insurance policy, like any contract, must be construed to effectuate the intent of the parties as derived from the plain meaning of the policy's terms."); *Colony Ins. Co. v. AIG Specialty Ins. Co.*, No. 15-CV-3896,

2018 WL 1478045, at *6 (S.D.N.Y. Mar. 26, 2018) ("[S]o long as the policy's language is unambiguous with respect to the issue raised by the parties, the policy is applied according to its terms.").

Because the 2015 Subpoena is not a "Claim," the rest of Protective's argument crumbles: if the 2015 Subpoena is not a "Claim," then it and the 2016 Lawsuit cannot be "Related Claims"; Castle Title's claim for coverage for the 2016 Lawsuit was thus timely filed on July 19, 2016, when Castle Title's insurance broker provided notice of the 2016 Lawsuit to Protective under Policy 18-01, (P's 56.1 Resp. ¶ 52; Compl. Ex. I at 1); and because July 19, 2016, falls squarely within Policy 18-01's policy period, Protective is required to defend Castle Title in the 2016 Lawsuit.[11]

Plaintiff's arguments to the contrary are unavailing. Plaintiff contends that the 2015 Subpoena and 2016 Lawsuit are "Related Claims" because "they are logically and causally connected." (P's Mem. at 2.) The 2015 Subpoena and the 2016 Lawsuit may be "logically and causally connected," but if the former is not a "Claim," which it is not, the two by definition

_____

[11] Castle Title observes that even if it had reported receipt of the 2015 Subpoena at the time it was served on July 21, 2015, it would have been covered by the first policy issued by Protective, Policy 18-00. (D's Mem. at 9 n.2.) Castle Title thus contends that "as a matter of equity," the 2015 Subpoena should not bar coverage of the 2016 Lawsuit. (*Id.* at 20-21.) But Protective correctly notes that the policy Castle Title purchased is a claims-made-and-reported policy and "'protects the insured for claims made against it and reported to the insurer within the policy period.'" (P's Mem. at 21-22 (quoting *Checkrite Ltd., Inc. v. Illinois Nat'l Ins. Co.*, 95 F. Supp. 2d 180, 191 (S.D.N.Y. 2000).) Thus, Castle Title's observation that it was covered by Policy 18-00 at the time it received the 2015 Subpoena – and thus would have been covered anyway – would hold water only if Castle Title had reported the 2015 Subpoena at the time, which it did not. *See Penn Traffic Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 914 N.Y.S.2d 534, 536 (App. Div. 2010) (failure to comply with notice requirement is failure to comply with condition precedent which vitiates contract as matter of law). Claims-made-and-reported policies have pros and cons, *see Am. Home Assurance Co. v. Abrams*, 69 F. Supp. 2d 339, 346 (D. Conn. 1999), and are priced accordingly. It would not be equitable to apply to one kind of policy the terms applicable to another.

cannot be "Related Claims." (*See* Policy 18-01 § III(U).) Policy 18-01 does not say a "Related Claim" is anything logically and causally connected to a Claim; a "Related Claim" must be a "Claim" with such a connection. (*Id.*)[12]

Protective further argues that its interpretation – that a subpoena relating to the insured's "Professional Services" is a "Claim" – is consistent with the scope of its coverage, which is limited to the insured's "Professional Services." (P's Mem. at 14.) That its interpretation might be consistent does not make Castle Title's – which reads "Claim" to include subpoenas issued in litigation related to "Professional Services" – inconsistent. Nor can its argument overcome the plain language that puts "involving Professional Services" as the modifier of "litigation or arbitration" rather than "subpoena."

Protective also states, based on the testimony of its outside counsel, that Section III(C)(4) of the policy is a coverage enhancement and that the 2015 Subpoena was a claim for which Protective would have provided Castle Title with counsel to respond had Castle Title reported it.

---

[12] Even if the 2015 Subpoena is a "Claim" as defined by Policy 18-01, the 2015 Subpoena and the 2016 Lawsuit are not "Related Claims." "Related Claims" are defined under Policy 18-01 as

> [A]ll Claims . . . arising out of a single Wrongful Act or a series of Wrongful Acts that have a common nexus, are interrelated or are logically or causally connected by reason of any fact, circumstance, situation, event, transaction, practice, act, error, omission, decision or cause or series of causally-connected facts, circumstances, situations, events, transactions, practices, acts, errors, omissions, decisions or causes.

(Policy 18-01 § III(U) (emphasis omitted).) A "Wrongful Act" includes "a negligent act, error or omission or Personal Injury committed by an Insured or any natural person for whose Wrongful Acts the Insured is legally responsible solely in the rendering or failing to render Professional Services for a client for a fee or other compensation." (*Id.* § III(Y) (emphasis omitted).) But the 2015 Subpoena contains no allegation that Castle Title committed any "Wrongful Acts," as that term is defined in Policy 18-01. Because there is no allegation of a "Wrongful Act" in the 2015 Subpoena, it follows that there can be no "nexus" of "Wrongful Acts" between it and the 2016 Lawsuit.

(*Id.* at 14-15.)  This extrinsic evidence is not properly considered in interpreting contract language that both parties agree is unambiguous.  *See Andy Warhol*, 189 F.3d at 215 ("If the language of the insurance contract is unambiguous, we apply its terms . . .  When a court decides, after examination of the contractual language, that an insurance policy is ambiguous, it looks outside the policy to extrinsic evidence, if any, to ascertain the intent of the parties."); *Dan Tait, Inc. v. Farm Family Cas. Ins. Co.*, 79 N.Y.S.3d 514, 517 (Sup. Ct. 2018) ("An insurance policy is a contract, and the Court must therefore be guided by basic principles of contract interpretation which instruct that a contract should be construed to give effect to the parties' intent as gleaned from the four corners of the document itself, provided that its terms are clear and unambiguous.") (internal quotation marks omitted).[13]  In any event, the argument Protective makes from this evidence – that the "coverage enhancement" would be rendered meaningless if read to mean that the litigation rather than the subpoena had to involve the insured's services – does not follow.  Under that reading, the insured would not be covered for all third-party subpoenas relating to its services but would be covered for third-party subpoenas issued in litigation involving its services.  That the latter coverage may be less extensive does not make it meaningless.[14]

---

[13] If the language of Policy 18-01 were ambiguous, it would have to be construed against the insurer, so Castle Title would still prevail.  *See Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 67 (2d Cir. 2000) ("Under New York law, equivocal contract provisions are generally to be construed against the drafter."); *see also McCarthy v. Am. Int'l Grp., Inc.*, 283 F.3d 121, 127 (2d Cir. 2002) (citing *Revson* in insurance contract case); *Lighton Indus., Inc. v. Allied World Nat'l Assurance Co.*, 348 F. Supp. 3d 167, 193 (E.D.N.Y. 2018) ("[L]ongstanding case law holds that ambiguities must be construed against the insurer."); *In re Viking Pump, Inc.*, 27 N.Y.3d 244, 257 (2016) ("[A]mbiguities in an insurance policy are to be construed against the insurer.") (internal quotation marks omitted).

[14] It is not illogical that Protective might want to go to the expense of covering its insureds not for every subpoena they might receive, but only for those connected to litigation in which the

Accordingly, Plaintiff's first cause of action is dismissed.

**B.      Second Cause of Action – Warranty Exclusion**

Protective's claim for "Warranty Exclusion" alleges that despite being served with the 2015 Subpoena, Castle Title warranted in its AIP Application for Policy 18-01 that it was not aware "of any incident or circumstance which may result in a claim," (*see* AIP Application at 6 (emphasis omitted)),[15] and that this false statement absolves it of any obligation to cover Castle Title.  Protective concedes that the AIP Application does not define "incident," "circumstance," or "claim," but nonetheless argues that Rauschenbach should have known that the 2015 Subpoena was a "Claim" because he could have consulted Policy 18-00's definition of "Claim" or asked his insurance broker about his obligations after receiving the 2015 Subpoena.  (P's Mem. at 24.)

First, as discussed above, the 2015 Subpoena was not a "Claim" as that term is defined in Policy 18-01, so to the extent Protective argues that Castle Title should have regarded the 2015 Subpoena as fitting that definition, its argument is unpersuasive.  Second, to the extent that Protective argues that Castle Title should have regarded the 2015 Subpoena as a "claim" as that term is commonly construed, its argument ignores basic principles of insurance contract interpretation.  Courts in this Circuit have consistently found the term "claim" in the context of insurance contracts to be unambiguous and to generally mean "a demand by a third party against

---

insured's services were somehow at issue, because the latter setting presents a greater risk that the insured could eventually be found to have some sort of liability.

[15] The AIP Application capitalizes the entire word "CLAIM," as well as the words "MAY RESULT."  (*See* AIP Application at 6.)  The supplemental sheet does not capitalize any portion of the word "claim" in its introductory section and capitalizes the full word by the check boxes.  (*See id.* at 9.)  Plaintiff's Complaint disingenuously capitalizes the initial "C" in claim when it discusses those documents.  (Compl. ¶¶ 54-55.)

the insured for money damages or other relief owed." *See Quanta Lines Ins. Co. v. Inv'rs Capital Corp.*, No. 06-CV-4624, 2009 WL 4884096, at *11 (S.D.N.Y. Dec. 17, 2009) (internal quotation marks omitted) (collecting cases), *aff'd sub nom. Quanta Specialty Lines Ins. Co. v. Inv'rs Capital Corp.*, 403 F. App'x 530 (2d Cir. 2010) (summary order).[16]  That definition would not extend to a subpoena for records.

At the time Rauschenbach completed the AIP Application on September 9, 2015, he had no reason to believe that a claim was pending against Castle Title.  The 2015 Subpoena simply sought information that SR Holdings might use to try to collect against the defendants in Foreclosure Action 1.  It did not begin to suggest that Castle Title owed anybody anything.  And Castle Title was not otherwise involved in any lawsuit.  It was never a party to the 2013 Lawsuit and there is no evidence in the record to suggest that Castle Title even knew about it.  The papers served on Castle Title up until the 2016 Lawsuit bore the caption and index number for Foreclosure Action 1, which did not involve any professional services provided by Castle Title. There was therefore no reason for Castle Title to think that it was obligated to provide notice of

_____

[16] Rauschenbach's conduct reflects that understanding.  After Rauschenbach was served with the 2016 Lawsuit Complaint, he reported the claim to Protective.  Rauschenbach also disclosed the 2016 Lawsuit in Castle Title's application to Protective for a third insurance policy.  (*See* Doc. 61-10 at 9.)

the 2015 Subpoena to Protective as a potential claim under its professional services insurance policy.[17]

Accordingly, Protective's second cause of action is dismissed.

**C.**     **Fourth Cause of Action – No "Loss"**

Protective alleges that any damages for which Castle Title may be liable on account of the fraudulent conveyances would amount to disgorgement uninsurable by law. (Compl. ¶¶ 65-70.) As discussed above, the New York State Supreme Court dismissed all claims and cross-claims against Defendant in the 2016 Lawsuit on June 28, 2019 (Doc. 87-1), which renders moot Plaintiff's fourth cause of action.

---

[17] Protective suggests that Castle Title had notice of a potential claim that could arise from the fact that at the time of its renewal application in September 2015, it knew that it had not yet complied with 2015 Subpoena. (P's Mem. at 23-24.) To the extent Protective means to suggest that potential proceedings to enforce the subpoena could constitute an anticipated "Claim," its argument is unavailing. For one thing, no such theory is even hinted at, let alone set forth, in the Complaint, (*see* Compl. ¶¶ 53-59), and a party may not amend its complaint or change its theory of liability in a memorandum of law in opposition to, or in support of, a motion for summary judgment. *Lyman v. CSX Transp., Inc.*, 364 F. App'x 699, 701 (2d Cir. 2010) (summary order) ("'An opposition to a summary judgment motion is not the place for a plaintiff to raise new claims.'") (quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1183, at 23 n.9 (3d ed. 2004)); *Brandon v. City of N.Y.*, 705 F.Supp.2d 261, 278 (S.D.N.Y. 2010) ("It is black letter law that a party may not raise new claims for the first time in opposition to summary judgment."); *Westport Ins. Corp. v. Laschever*, No. 06-CV-519, 2008 WL 4874132, at *2 n.1 (D. Conn. Nov. 10, 2008) ("[A] party cannot amend its complaint through a memorandum of law in support of summary judgment."), *reconsideration denied sub nom. Westport Ins. Co. v. Laschever*, 2009 WL 497641 (D. Conn. Feb. 25, 2009), *appeal dismissed as moot sub nom. Westport Ins. Corp. v. Nat'l City Warehouse Res.*, 399 Fed. App'x 607 (2d Cir. 2010) (summary order). Further, there is no evidence that as of the date the renewal application was completed, there was any suggestion that a motion to compel was in the offing. (*See* Compl. Ex. D at 12 (stating that SR Holdings had extended Castle Title's time to respond to September 3, 2015, and that on September 3, 2015, Castle Title requested – and SR Holding apparently did not refuse – an additional extension to October 1, 2015).)

D.    **Fifth Cause of Action – Recoupment of Defense Costs**

Protective's fifth cause of action is for "Recoupment of Defense Costs," if it is determined that it had no obligation to defend Castle Title in the 2016 Lawsuit. (Compl. ¶¶ 71-74.) Because this Court has determined the opposite, Protective's fifth cause of action for "recoupment of defense costs" is dismissed.

## IV.    CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment is GRANTED and Plaintiff's cross-motion for summary judgment is DENIED. The Clerk of Court is respectfully directed to terminate the pending motions, (Docs. 58, 66), enter judgment for Defendant, and close the case.

**SO ORDERED.**

Dated:  February 3, 2020
        White Plains, New York

_____
CATHY SEIBEL, U.S.D.J